Morning everyone. Ms. Scheib, are you ready to proceed with your five minutes of uninterrupted May it please the court. My name is Megan Scheib and I represent the appellant in Charles Reynos. At this time I'd like to request seven minutes rebuttal. Thank you. Inherent in every robbery is an element of force, and many robberies will involve some movement by the victim. To subject a defendant to the steeper enhancement of the four-level abduction enhancement under the guidelines requires something more than the force and the movement that was present in this case. Today the court is asked to decide the meaning of abduction as that term is contemplated by the guidelines. The guidelines provide that a victim is abducted when he is forced to accompany an offender to a different location. And they provide the one emblematic example of the act of forcing a bank teller outside of the bank into a getaway vehicle. This definition in this example is consistent with our everyday understanding of the term abduction. We provided the district court with three dictionary definitions of the term abduction, all of which included the following language, carrying away or taking away by force, kidnapping. Here the district court erred by applying the abduction enhancement in a case where there was no abduction, no carrying away by force. Instead, all we have is forced movement in one location. And we don't deny that the force in this case was offensive. It involved the brandishing of a weapon and the breaching of a locked door. But those two facts do not constitute abduction as that term is meant in the guidelines. The guidelines can't possibly account for every aggravating circumstance to occur in the course of an offense or in the course of a robbery. But that doesn't mean that this court should force a square peg into a round hole by defining this case as an abduction. The district courts have other mechanisms available to them to account for the entirety of the defendant's conduct and any aggravating circumstance that may not be specifically captured by a guideline enhancement without distorting the meaning of abduction. My argument today will focus on two issues. First, and primarily, the question of a different location. And secondly, the meaning of forced accompaniment, both as those terms are defined in the abduction guideline. Judge Ambrose was correct in his dissent that there was only one location involved on these facts, and that's Ed's Pizza Shop. The dimensions of the pizza shop support this conclusion. It was just over 800 square feet, and the distance traversed by the employees from the bathroom to the register was a mere 34 feet, a distance that could be traveled in seconds and that could fit in this courtroom wall-to-wall with room to spare. Standing at the door of the bathroom, you're a mere eight feet from the counter on which the register sits. And these dimensions denote one location. The district court and the government here rely too heavily on the presence of the locked door, and by doing so, engage in the overly legalistic approach cautioned against by U.S. v. Hawkins that says that neither the presence or absence of doorways, lot lines, thresholds, and the like should determine the question of a different location. And here, that's the only fact that even arguably supports a finding of a different location in this case, and it's not enough to turn Ed's Pizza Shop into two locations for purposes of abduction. The Sentencing Commission told us what it means by the phrase a different location when it provided one example, and that was taking a teller of a bank out of the bank, forcing them away from the bank into a getaway vehicle. The facts of this case are profoundly different. Turning to forced accompaniment, it's difficult to define that in isolation from the concept of a change in location because it is not a stagnant act. It is what happens in the change of location. It's an aggravated movement in concert with the defendant from one location to another. Here, all we have is compelled movement from point A to point B within one location, and we have no facts of record to tell us what occurred in those 34 feet. We do know that one of the employees walked right out of the front door upon leaving the bathroom. I point this court to the Fifth Circuit case from United States versus Reed, where in the context of a bank robbery, they observed that in virtually every bank robbery in occupied premises, you'll have movement of an employee of the bank from point A to point B within the bank. But to define that as an aggravated accompaniment would unnecessarily convert ordinary robberies into ones involving abduction on only the faintest of distinctions. And that logic is sound and applies with equal force to this case. What would be the rule of law? This issue can't turn only on the amount of square footage. This is a small facility, but I think you'd agree that you could have a very small pizza shop, a very small bank that was laid out in such a way that even you would agree that the defendant's action in that case would constitute an abduction. What is the rule of law? The case has said you can't look for barriers, and you've made that point. You're arguing that it should be inside versus outside. In those kinds of cases, they talk about a hostage or a shield, but those are easy. And I don't think you're arguing that the abduction enhancement is limited to the hostage-shield situation, because that's not what they said, even though that's the comment they gave. What is the rule of law that could be applied in a fair, non-disparate way to this sentencing enhancement? Judge McKee, I don't think that this Court needs to apply a strict test that anticipates every possible factual scenario. I think that this Court's task is to define or to discern what the Sentencing Commission intended by abduction. Well, doesn't that require us then to attempt to define a different location? Because if we don't, then we're left with nothing but ad hocery and no kind of guidance at all to the district courts. Yes, and I think we can define a different location by looking to the language of the guidelines, and in the context of abduction, it requires a geographic site, a change in location. And to go back to something Judge McKee raised about whether he's correct, but I do not contend that it could never happen within the confines of one location. It is an easier set of facts. When can it then? For example, in United States v. Osborne, you have a case where the movement within one location is still consistent with the act of forcing a victim away. He was using them as a hostage, forcing them to go away with him. But isn't this exactly like Osborne? Because in Osborne, the point was made, it's a pharmacy. The pharmacy had a locked area. He took them out of the locked area. Here, they're in a locked bathroom, and he screamed threats and essentially broke down the door. If you're talking about an extraction from a safe haven outside of the safe haven, isn't that getting to the issue that we really have to deal with, and that is aren't we increasing the risk that the victims are exposed to, whether it's 800 square feet or 1,000 square feet? Well, I think this case is materially different from Osborne. Even though you're correct, they both involved a locked door and movement outside of a locked area. However, that was not the focus of the court's analysis in Osborne, and for good reason, because what they focused on was the circumstances consistent with abduction, where they're being held at knife point in close contact, walking immediately before and in close contact with the robber, winding through the aisles of the Walgreens. And it wasn't about the removal from the pharmacy. It was about the moving away from the Walgreens. Osborne doesn't say that. Osborne doesn't say it's all about the moving away. It talked about the movement with the increased harm, because you have a victim and you have a defendant and you have the force. And the same thing happened here. I mean, it was 34 feet from a locked bathroom to a different location with these two people, one of them a victim and one of them with a gun, that increases the harm. If you talk about the guidelines you're supposed to be intending by this abduction, it is that proximity of the victim and the defendant. What are we to tell the district court? Just do what you want and then we'll decide on appeal whether we like it or not? Isn't there some level of deference when the district court is supposed to apply the guidelines to the facts of the case, as Judge Goldberg did very carefully here, extremely careful scrutiny of the video and explained his reasoning, the flexibility of Osborne and Hawkins? What are we supposed to tell the district court? We'll know it when we see it? What test? There really needs to be a test. We need to give the district court guidance. We can't just say, well, this wasn't a different location. What do we tell them? Your Honor, I'm going to answer your question in two parts. First, with respect to how you characterized the case of Osborne, the court there didn't say it was all about moving them away from Walgreens, but they did say that it was about conduct that was engaged in by the defendant that was plainly targeted by the enhancement, which is keeping the victims close by as readily accessible hostages and providing himself with a potential hostage, thereby placing them at a greater risk of harm. It was not about the removal of them simply from a locked place. So I respectfully disagree. The greater risk of harm is the policy reason behind this, isn't it? I mean, it's what underlies the concern about moving a victim some distance, because as you do that, you have enhanced the possibilities of harm coming to that victim, right? That's simply a reason. But you still haven't answered what I asked earlier and what Judge Rendell has in part in her question restated. What's a definition? What's a rule? How can we give the district court something? Judge Ambrose, in his dissent, gave us something, but I haven't heard you refer to it. He spoke of some line of demarcation. Is that a test? Is that a rule that we could use? You've also referred to the guideline commentary, which gives us a singular example, and that singular example requires you to go outside the building. So is the test that it has to be one building to another or one building to the outside? What's the test? I would propose that a definition of forced accompaniment is one of aggravated movement in close contact with the defendant, consistent with abduction, and different location would be defined as a geographic site or change in location or an effort to change the location by means of a geographic site, similar to Judge Ambrose's dissent, or exactly like Judge Ambrose's dissent. However, again, I don't think that requires you to have to leave a building, and I point to Osborne or the examples provided by Judge Ambrose where you have the large shopping mall or you have a large office building. Let me ask you about force. Does force mean applying physical harm or threatening physical harm, or is force understood from the perspective of the victim feeling compelled to do something? I think force can qualify as both of those things. I ask the question because I'm not sure about the exercise of force in this case. There was apparently no evidence that the victims were moved at the point of a gun, for example. I agree with you that in the accompaniment there was no force. That's been our position all along. But what about the fact that he shot? What about the fact that Reynos shot open the door? Judge Fischer, if I could correct one point of fact there, the door was not shut open. He kicked open the bathroom door. He didn't discharge his weapon until after the victims had left the store. He did kick the door in. He kicked the door in. That's correct. Yes, that's an example of force. Referring to Judge Fuentes' concern, there was no force in the accompaniment. We admit that there was force involved. Didn't he brandish a gun? He brandished a gun and said, I'm going to start shooting? Yes, and that was the gunpoint command, but it's our position that movement compelled in response to a gunpoint command is not enough for abduction. To point this court to a Third Circuit presidential case, U.S. v. Copenhagen, which while it dealt with physical restraint, the majority said that they declined to find whether some action in the response to a gunpoint command is enough for even the two-level restraint enhancement. And here we're talking about whether we're going to apply the four-level restraint enhancement for the same conduct. In Copenhagen, wasn't the restraint, didn't they rule based on the fact that he was put in the fireplace? That was the key back to the restraint there, wasn't it? That's exactly right. That was the physical restraint. But look to the facts of what occurred prior to placing the victim in the fireplace. You have a defendant leaping over a counter of a night clerk at the Old Stroudsburg Inn, forcing him at gunpoint into a back room, forcing him down to stay next to a photocopier, going back and getting him at gunpoint, forcing him again back to the area of the register, and again into another back room, all at gunpoint, and then finally restraining him in a fireplace. And so the fact that in that case we're talking about two levels, I think is illustrative of why this case, which involves unquestionably less onerous facts than Copenhagen, and we're talking about abduction. Was abduction litigated in Copenhagen? No, it was not litigated. We don't know what the court might have thought about that. No, but the fact that the government and probation didn't interpret those facts as abduction, and the court, there have been cases where courts. It wasn't an issue, right? So we can't really draw that. But you, in your own briefing, seem to take the point that increased risk is the issue. You say on page 15 of your brief, because the movement from one to the other location did not increase the risk to the pizza shop employees greater than that which is already inherent in the robbery, it shouldn't be viewed as a different location. So am I right in understanding your position to be there's something about increased risk that ought to be taken account of in deciding whether there's an abduction? Yes, Your Honor, but an increase in risk associated with abduction. Not any risk, not any harm. It's also circular. So if you say increased risk, explain how it can be the case that kicking a door in and taking somebody out of a locked room and exposing them to the gun that's being held by the perpetrator doesn't meaningfully increase the risk to which those victims are exposed. It does increase risk, but not the type of risk that this guideline enhancement was meant to target, and not risk that is sufficient to qualify for the four-level enhancement. I would point you to the vast majority of cases that applied abduction, and you can see all of the fact patterns easily fall within the interpretation of abduction as we've proposed it here today. You have in U.S. v. Wooten, forcing someone outside from the... The threshold, you're going back to the threshold? Because if that's... It seems like it's tough for you to have it both ways. If you've got this entry-exit theory, then you're putting a lot of emphasis on the fact that there's a doorway, and here there's a kicked-in doorway. If you're going to say it has to do with close contact, well, the guy was taken out of the bathroom at gunpoint and marched down two hallways to the cash register. Sounds like close contact and physical threat. I mean, you say this is vastly different. How is it vastly different? In this case, we do not have exiting or entering a building, so clearly that's different. And also, walking 34 feet within the confines of the structure that the robbery occurred is not abduction. It's mere movement in response... That goes back to my question. What's the rule of law? It can't just be a linear measurement. If that's the case, where 34 feet is not enough, what about 54 feet or 64 feet? There's got to be some way that the space is configured. And if there's a physical barrier there, it seems to me it gets closer to location, the definition of location. But what you said earlier about a position of safety, would you agree that if someone takes, the defendant takes someone from a position of safety to a position where they're no longer safe, and in doing so there's some movement, no matter how long, and there's also transgression across some physical barrier, no matter how secure or how elaborate or how firm, that would be enough to constitute abduction. Because that's a rule that's workable, and it seems to address your concern about not applying this deadline too broadly. But yet, if that's the rule of law, it seems to me that rule of law fits here. Respectfully, I disagree that any movement from one position to another that increases the risk of harm is an abduction. You can have movement that increases the risk of harm that simply doesn't fit into this enhancement. We don't have... But I am in a physical barrier. No matter how you define barrier, some physical barrier, be it a locked door, an unlocked door, a photoelectric cell that's guarding a doorway without a door, some physical demarcation to separate point A from point B. So it can't just be the person pointing the gun at the victim and saying, okay, take one giant step forward. There's a change of location there, but that's not an abduction, I don't think. I'll ask Mr. Sosmer about that. So I'm trying to get at the principle of law that is workable, and I think it goes to the same concern that was expressed by some of my colleagues. Maybe I can just supplement that. When do you cross from being a restraint to an abduction? I think that the restraint enhancement is clearly about the act of compelling someone not to move and confining them, tying them, restraining them. It's the opposite of taking them away as an abduction. So is your position here that if we don't apply the abduction enhancement, there should be nothing? Or is your position that abduction is not proper, but physical restraint is? No, we can test if physical restraint were sought, assuming this case is remanded, and we would oppose the application of the two-level enhancement. Restraint didn't occur here. An application of restraint on these facts would be an outlier in Third Circuit case law. Indeed, it would have been a restraint if he kept them in the bathroom. If he had gone to the bathroom and shot his gun into the air and said, you all better stay in the bathroom, then we have restraint. That's a perfect example of restraint. Instead, he led them, he led Gutierrez at least, he led them out, took them out, and led them out of the bathroom. Exactly. We may not agree with when you say he said took them out. We may not want to agree with that. He didn't physically take them. He forced them out. With a gun in his hand. With a gun in his hand. He kicked down a door and got them out. Similar to many robberies where you have occupied premises, it was a gunpoint command to get me the money. And yes, there was an incidental 34 feet, then traveled from the bathroom to the register. You're not equating this situation with a situation where, let's just say it's an open room, no locked door. You're not saying that that situation is the same as someone extracting someone from a locked safe haven, are you? No, clearly you have a different fact there. But what I am saying is that the mere presence of that door, that one fact, is not sufficient to change one location into two for purposes of abduction. Well, you've said that you think that abduction can happen in one building. Let's say the bathroom was on one floor and the safe, wherever the money was, was on the second floor or the third floor, whatever floor you want. Is that sufficient for abduction? No. Let's make it 1,000 feet. No. Again, and I understand the court would like a more specific rule of law, but I simply don't think abduction can be defined by the number of feet or a floor. You have to step away from the weeds and look at the case and say, was there a taking away? Was there an abduction? It's fact-sensitive. So you've said that you believe that there is a situation where that can occur. Yes. Give us the facts when you think that an abduction can occur in one edifice. In one edifice, I agree with Judge Ambrose, that it's more critical that you have the aggravating circumstances consistent with abduction. I would point to U.S. v. Johnson, where you have the bank teller being held at knife point in a choke hold and forced to move 80 feet while being held between law enforcement, who at the time had entered the building and surrounded the building. So there, yes, we have one confine. She never left that building. The guidelines don't say that. The guidelines say forced movement to another location to facilitate commission of the crime. They don't say, and with some aggravating circumstance. Are we, as a court of appeals, supposed to add things that aren't there to the guidelines? No, I'm not asking this court to add a requirement, per se, of an aggravating circumstance, and maybe I haven't artfully stated it, but the aggravating circumstances really are just telltale signs of a classic abduction, of what an abduction means. I don't understand. In the same term. I mean, you cannot define a word by using the word. I don't understand your position on restraint. Why is there no restraint here? Does it involve movement? Does it have to? Does it mean that there's no movement at all? This court has never defined restraint as broadly as would be required here, which is simply movement in response to a gunpoint command. Wasn't Eubanks restraint? In Eubanks, the defense conceded. Excuse me, I didn't mean to interrupt. In Eubanks, that case was about abduction because the defendant conceded restraint from the get-go. The defendant sought restraint, not abduction. The court, therefore, analyzed abduction, and restraint was a giveaway there. I would disagree that. What were the facts of Eubanks? The facts of Eubanks were a robber enters the store or bank and forces one victim into a back room at gunpoint to retrieve a surveillance video and forced another victim onto the ground and then dragged them by their hair. That may have amounted to a restraint. The court's analysis, however, did not focus on restraint because it merely was where all parties, government and probation, had agreed to restraint. In this instance, there were six feet. Yes, Judge McKee, there were six feet. The victim was dragged by her hair six feet, which I don't know if that's what the defense was conceding was restraint, but I would argue that the restraint did not occur from the point A to point B movement, and this circuit has never found that. But wasn't the distinction there in the Seventh Circuit, they've defined abduction as including forced movement. No. In the Seventh Circuit, they have not. They've defined restraint, excuse me, as including forced movement. So they needed to therefore change something in order to call it an abduction. Isn't that correct? No. The Seventh Circuit, actually, if you look to the case cited by Judge Ambrose in U.S. versus Carter, which is the Seventh Circuit, they require more than forced movement for restraint. They require the sustained focus of the defendant's weapon on the victim in addition to compelled movement. Well, physical restraint is actually defined in the guidelines as forcible restraint of the victim, such as being tied, bound, or locked up. Correct. And those are meaningful signposts as to how a court should define restraint. But respectfully, this case is not about restraint. We don't have anyone seeking restraint here. The government, probation, and, in fact, Judge Goldberg, on the record in the first sentence. I think you've finished the answer. I want you to finish the answer, but I think, you know, we have a little bit of time for rebuttal. So we'll have you back on rebuttal. In fact, there's one question I've been trying to get in, but I'll get you first when you come back. Thank you. I hope. Maybe and maybe not. Yeah, exactly right. Well, I'm happy to answer that question as well. Okay. May it please the Court, Robert Zosmer on behalf of the government. Good morning, Your Honor. I'm going to focus my argument on location because it seems that that's what the Court is most focused on and appropriately so. Of course, I think as I said in oral argument the first time around, there are really four elements to this. There's force, there's accompaniment, there's location, and then there's the purpose. The purpose being either to facilitate escape or to facilitate the offense itself. And I'm happy to address any of those, but location seems to be the tough one. That's the one where, if you'll excuse the expression, we need to draw a line. We need to know when have you moved from one location to another. And it's very difficult to come up with that line, given that there are millions of possible places that this could apply to. I do think there's a test, though, that can be derived from the guideline, the commentary, the case law on this. And the test, I think, has even been suggested in many of Your Honor's questions. And that test is, first of all, it needs to be a different location. It needs to be a different place in terms of structure or purpose that makes a logical person say this is one location as opposed to another location. And I think that the assessment also of whether it's different in structure and purpose on the particular facts of the case needs to be informed by what the purpose of this guideline is. The purpose of this guideline, obviously, is to recognize when there is more aggravating conduct involved in a bank robbery. And many of your questions have suggested one of the things that makes this more aggravating. And that is the increased risk that you're subjecting the victim to by taking a person from a place of greater safety to lesser safety. The other aggravating part of it, of course, is the terror that's inflicted. It's terrorizing enough when somebody goes in and points a gun and demands money at the threat of grave harm or even death. It's worse if someone's more terrorizing, if someone as here has locked themselves in a place of safety and is forcibly removed. And so I think that's basically the standard. I'm not sure we can state it more precisely than that and then leave it to our district judges to apply that as faithfully as they can to the myriad circumstances that come before them. And then I think review of that is for clear error as to whether the district court has clearly erred. This case I would respectfully submit is not a difficult case. And it's all about the locked door. We can certainly, I'm sure we'll talk about different hypotheticals and harder cases. But here you have a place in which these three victims crammed themselves into this bathroom. I don't know if any of you have looked at the video, but this bathroom is two and a half feet wide and six feet long. And these three men, obviously scared, pushed themselves into this room, locked the door. And Mr. Reynos needed to literally kick a hole through this wooden door, reach in and unlock the door and take them out. That's an abduction. That is taking them from a place that is different in structure. It has a completely different purpose from the rest of the restaurant, even if it is a small restaurant. It's the restroom. And it's a place of safety for them that Mr. Reynos has breached in order to take them out. Now again, if I stopped someone on the street and said, abduction, define it for me, I expect that they would say kidnapping. But we're lawyers. We know that that's not how statutory interpretation always works and that terms are sometimes terms of art. And here what we're required to do is apply this term as the guidelines have defined it. The guidelines define it as forcible accompaniment to a different location. And that's what we have here. And this particular case falls squarely within the cases that we've described. Osborne cannot be distinguished. This court, of course, has every right to disagree with the Fourth Circuit if you wish, but I think that the decision in Osborne is well informed and it's correct. Same case. One room. There's a locked area that these people are removed from and taken to the front of the store. This focus on aggravating factors with all due respect to Judge Ambrose, I don't think is correct because what that is doing is it's jumping to element number four. We know that the last element is that it needs to facilitate the offense or facilitate escape. And the examples of aggravating factors that are given is taking a hostage, doing a getaway. And that is not helpful earlier on in defining what is the location. I do agree, and maybe I can even persuade Judge Ambrose, I do agree with the part of his decision that says what you can also look to in defining this is is there some line of demarcation, a doorway, a line of threshold. That's what I'm talking about when I say a different structure, a different part of the structure clearly met in this case, not just a doorway but a locked door that needs to be breached. I'm happy to answer. What if the door was unlocked? Would that make a difference? But there was no door at all there. And in terms of the purpose of sentencing someone, I think maybe I've answered your question in asking it. Why would the culpability be different if the door was unlocked, or if there's no door there? Okay, one at a time. If the door was unlocked, I would probably still be making the same argument. You would be. But I would not be saying that it's as strong a case or the lock didn't work. But they've moved themselves into a different part of the building. It's a different location. Imagine, for example, if the 911 operator, but they call on the cell phone. We don't have the tape, unfortunately. But I would imagine the operator would say, what's your location? I doubt they would say, Ed's House of Pizza. Their location is, we're in the bathroom. We put ourselves in the bathroom. Well, I'm not so sure about that. Well, it doesn't really narrow it down very much. We're in the bathroom. Well, it does for this location. So I would say an unlocked door. If there's no door, probably I may not be making this argument. That's the Eubanks case. And the more I've studied this and thought about it because of this and bank designation, I'm not so sure that we disagree with Eubanks. The Eubanks you have, it's an open area. One is just six feet, pulling a person from one place to another. The government, as I can tell you in our district, we have not advocated the abduction enhancement. When somebody is in the same room and they're told, you, come over here, it happens all the time with the bank telephone. And the district court asked about that, and Mr. Labarge did not know of any case where that had been advocated before. That's right. And we haven't because it really doesn't fit with the way I've defined location as being some separation and some movement. I'm interested in, again, hearing your definition of different location because if I understand it correctly, and if my notes paraphrase accurately, you first said it's a different place. And I don't quibble with that. In fact, I picked up, for lack of anything better, Black's Law Dictionary, looked the locus in every locus definition practically I saw, used the word place in a synonymous fashion. But then you went on to say it's a different place in terms of structure or purpose. If we're looking textually at 1B1.1, where do we get anything out of purpose when isolating a different element, different location, and trying to give it shape and form, trying to give it meaning? Well, the guideline uses the word location and does not define it. Textually, at least, if the commentary is, as we know, authoritative in terms of helping us to understand, and the only thing we have is a single, singular example which takes the victim from within a structure to outside that structure, why should that not determine the meaning of different location? Because the guideline says, for example, and then only gives one example. And this court has often interpreted provisions like that and concluded, as I think every other court has, that that does not mean that you don't look to other things that fall within the broader definition. Does the rule of lenity come into play here? I mean, here we are arguing about what's a different location. Isn't there some ambiguity there that suggests that we should look at it and provide the narrowest definition? That's a reasonable question, Your Honor. At the end of the day, I... Mr. President, other questions have not... None of mine were reasonable. Finally, we got a reasonable question. Don't lead with your chin, Chief. I was coming back to that. Judge Van Atze, the rule of lenity, as we know, is the rule of last resort. It's the rule that's to be used when there is no construction that can be obtained after using every source we can, including our logic and statutory materials of the dictionary and anything else. And so certainly there is an ambiguity when we first look at it, but once we consider it, and especially, as I suggested, this also goes to Judge Smith's question, especially interpreting it in light of what we know the purpose of this guideline is, which is to address the more aggravating factor when greater risk and greater terror is inflicted on a victim. I don't think we have ambiguity at the end of the day, and therefore the rule of lenity, which very rarely applies, should not apply here either. But how do we make this workable for the district court? How do we give them some kind of rule? Let's just say, hypothetically, that this in bonk court reversed the determination. Now, we've set aside an adjudication by an experienced district judge who has made a certain number of findings of fact. What are the district judges to take from that? Let me follow up on my previous question and just ask this so you can shoot it down. What if we were to suggest one of two courses that consistent with what we believe textually can be derived from the commentary and the guideline, that there is either a rebuttable presumption that what we have is a different place where you move out of a building or from a building to another structure, and that all that is required then are findings to rebut that to suggest why it is not another location. Or, similarly but not using words of presumption, that there is a weighting, and that if it is determined to be a different building or structure, that is weighted prominently but can be overcome by other facts. Would either of those be a workable solution here that would be both helpful to the district court judges and also consonant with the language of the guideline? Well, with respect, I doubt it. Because the question would then arise, what overcomes the presumption? What facts do you need? And you're right back to the same line-drawing question. I agree this is not easy, but I've attempted to state a definition that I think is workable and does give the district court guidance. I'm surprised you're giving us a definition like that. I thought you were going to stand up there and say, we should follow the flexible case-by-case approach of Hawkins and Osborne. In other words, location is not a point, it's a range. All the cases talk about that. I absolutely think that it's a case-by-case flexible determination, and I think because I haven't given you a specific definition, I think it reflects that. So if it's flexible case-by-case, does that mean the same set of facts, we as a reviewing court should affirm decisions regardless of whether the abduction enhancement is applied or not applied? In other words, should we give discretion to district judges the same way we do under 3553A and other sentencing review that we do? Well, yes, I think the best any of us are going to come up with, and we've attempted to give an explanation of what a different location is in the context of this guideline. But at the end, it's going to be the district judge exercising his or her discretion to apply it to the particular facts of the case. And the review will be reflected, Judge Rendell is getting to the question, the review will be reflected in the clear error standard. So if the district court here had found physical restraint instead of abduction, it would be very difficult to overturn that determination. Yes, I agree with that. To talk about physical restraint, physical restraint ordinarily is going to be involved in any case that involves abduction. The guideline itself reflects that by putting it in the same guideline. It's in the very same sentence. And here I would have no hesitation, if our position does not prevail, in saying that you have physical restraint when someone is forced at gunpoint to move in a particular way to a particular place. That's the Carter decision in the Seventh Circuit that was cited by Judge Ambrose in his dissent. But the fact that you have a lesser, a two-level enhancement that would apply doesn't preclude the greater. I mean, we could be here all day talking about examples in the guidelines where you have a certain number of levels for bodily injury and then many more levels for greater bodily injury. In fact, it goes back to Judge Pinoy's question where he said that if abduction doesn't apply and restraint doesn't apply, then nothing applies. But it seems to me that's part of the mathematical Excel spreadsheet insanity of the guidelines. We're at about four points versus two points. I think at the end I was going to ask, this is the question I wanted to get to, Ms. Scheid, that you volunteered to answer. Any sentencing judge could look at this and say, well, this is the situation where the defendant went in, kicked down a door, took people out of that door to another location to open the cash register. I'm either going to go up in the guidelines or I'm going to hit the very top of the range of the guidelines. But this guy is getting a stiffer sentence than is suggested by the advisory range of the guidelines. That's the way we used to do it. And now it seems like sentencing judges have got reasonable questions. They've been deprived of their common sense and looking at what is the culpability of this defender, what is the gravity of the offense conduct, and how do I impose a sentence which reflects that? You don't need a lot of fancy Excel sheet and 4.2 point to get to that point. I agree completely, Your Honor, and I'm glad you asked that question. It's reasonable. More than reasonable. Your Honor, but that gets to the final sentencing determination. For better or worse, this court has held, and every other court has held, this court is required to accurately calculate the guidelines and consider them in the final sentence. And I think what your question gets to is the final point. If I can say about physical restraint, if I were writing the guidelines or maybe many other people in this room, I'm not sure that we would make that only two points and make abduction twice as bad in terms of offense levels. It's a pretty horrible thing to go into some innocent person and tie them up or restrain them in order to do whatever illegal thing it is you want to do. If Reynolds in this case had broken down the bathroom door and pointed a gun at the three individuals in the store and said, give me your money, or moved them out into the hallways, each one of you give me the money, I think you would find perhaps an abduction in that case? Yes. Does it make a difference between that and saying, move over to the cash register 30 feet and then take the money out of the register? I don't think so, not in this particular case. No, it would be facilitating the offense, which is the robbery. So it's just breaking down that door that constitutes what? It's what makes it a different location, because it is a different location. Breaking the door, even though Reynolds stays in the same place, the victims stay in the same place? Oh, your question was taking them out. I mean, there does have to be forced accompaniment to a different location. So the idea is telling them, get out of the bathroom, come in the hallway and give me your money? That's right. In applying any standard, they're going to be a range of cases. Certainly it's more serious to abduct them and take them away for a week. But we have to apply the definition that we have here, and it does fit within that definition. To finish, if I may, what I was saying... What if they were hiding behind, instead of being in a locked bathroom, what if they were hiding behind a stack of empty pizza boxes? And Reynolds found them, and with his gun he whacked the pizza boxes and said, somebody come with me to the register. Any difference? Probably not. Well, no, there probably is a difference, and I think that's the kind of thing in my office we'd have a nice discussion about. And we probably... We'd learn why the pizza boxes are... Right, and we probably, while eating pizza, and we probably would not pursue the enhancement in that instance, because they're within the same room in the pizza restaurant. And there needs to be some demarcation line. But wouldn't it be a place of safety, relative safety, that they were taken from, hiding, to exposing them to danger? Oh, definitely. And that's why I'm saying we'd have a discussion, and I'm not precluding it. It's a much harder case. But isn't... Go ahead. But at the end of the day, it's Booker that sort of rides to the rescue, because once you have faithfully applied the guidelines, which I think you need to do here, and decide is this forced accompaniment to a different location, then the judge has to consider the guidelines as well as all the 3553A factors. And that's the time, and that's what we've committed to the district judge, to say, you know, I really don't think this ranks in terms of abductions, or I don't think this isn't more like physical restraint. That's the system that we have now that squarely addresses Your Honor's concern. But we're at an earlier stage... Mr. Zeller? Sir? Can you shift to the... You mentioned the district court here, and you've asserted twice that this should be clear error review, and I just want to explore that with you for a minute. The decision whether or not something is an abduction, that's ultimately a legal conclusion, isn't it? As you've said at the very start of your presentation, it's a term of art, right? Right. Okay. So if that's a legal conclusion, based certainly on underlying facts, but ultimately a legal conclusion, why is the standard of review for whether it's abduction or not clear error? Well, looking at the entire case here, as I think we've said before, this is a mixed question of law and fact in this case. The question of law is what is an abduction, and I think that's what I'm addressing here. Once this court defines that... I'm trying to get past that. We're down the road. We're at the next case. This district court judge is wrestling with what I'm sure will be a lucid and persuasive opinion by whoever writes it. And a reasonable one. And is trying to understand what to do and says, I think the following things happened here, and that's an abduction. And it comes back up to us because somebody in Ms. Shive's office disagrees with that conclusion. What are we going to say when we get that? How are we going to review it? What's the standard we tell the district court that we're going to be applying when we look at these conclusions they make about an abduction? Well, this court will state a lucid standard, and it probably will be more lucid... By definition. Right, right. It will be more lucid, I'm sure, than the one I've suggested, but there will be a definition. And then what this court will do when it comes back on the next case is see, did the district court understand the definition, or did it apply some completely different definition? And if it did understand the definition, did it commit a clear error in applying the facts to that appropriate definition? At this stage, for Mr. Reynolds, we have a mixed question of law and fact because we're here to talk about what the standard of law is as well. And I'm suggesting that we have an abduction here because we're defining different location, and under any reasonable definition, we had a different location here with the locked back door. Isn't this case very much like the guideline provision that something is related? And in Buford, the Supreme Court said, you know, whether it's related or not, we're going to let the district court... We're going to have some deference to the district court because they see these things all the time. Isn't it a little bit like our case in U.S. v. Richards where we had to decide whether the district court had properly found that someone was a high-ranking official? Now, that's not a legal term, just like different location is not a legal term, but it's also not purely factual because we know what the facts are, but it's applying that definition to the facts at hand. And isn't this kind of a middle ground where maybe it's not clear error, but it's the kind of situation where the facts are going to change constantly? The district court is going to see 30 feet, 50 feet, an unlocked bathroom door, pizza boxes, and it's going to have to decide, and we give some deference, if you will, to the decision? It's not necessarily legal. It's not all fact-based, but it's a mix. I think that is a very reasonable suggestion, Your Honor. Is that too reasonable a question? That was a suggestion. Your Honor, we haven't talked a lot about Buford since Booker because so much has changed since Booker was decided. Buford is from an earlier era, but the Supreme Court unquestionably said there that there are these mixed questions of facts and law where you just have to defer to the district court's discretion. The court has not returned to that since Booker. We've fallen more into a, you know, multi-step process of going through calculating the guidelines and then the 3553A factors. But I think you make an outstanding suggestion, which is that this may be the case that brings us back to that, to seeing that there are guideline provisions where the law and the facts are so entwined and so varied in their application to so many different situations that there needs to be discretion to the district judges. The premise of Buford, of course, is that the district judges will see infinitely more of these cases than this Court ever will. This Court is limited in its resources in reviewing the cases, whereas the district courts are imposing sentence on a daily basis, and they're the ones who can fashion this. Of course, guidance from this Court is necessary, and that's what I've tried to suggest. But why so? Let me bring you back to a concession, I think, that your adversary made, and that is that she thought that there could be an abduction intra edifice or in the same building. Suppose, a la Judge Fisher's question, although sans the pizza boxes, there was a second floor, but there was no lock door. They run up to the second floor, and they're basically cowering in a corner, right? They're not hidden behind anything. Reynolds goes up with the gun and orders one of them downstairs, okay? So we don't have the removal from a locked door, but one would argue that, at the moment, that they went up there was a safe haven. Do we have abduction in that situation? Yes, we do, and I think that was an important concession. In fact, the panel was really unanimous on that point, that there can be an abduction within the same building. Judge Nygaard, I thought, in his opinion, spoke very eloquently to that in terms of this courthouse, that if somebody were taken from the clerk's office on the second floor and pulled up here for the purpose of facilitating a crime, I don't think any of us would hesitate to say. That's Osborne, basically. Right. Well, our case is closer to Osborne than the courthouse example because Osborne takes place in the same room. Even in the same room, I think everybody has conceded you can have it. It really depends on how big the room is. The facts of Osborne, was that a Walgreens store? That was a Walgreens store. Actually, I don't think it says how huge it is. I've been in Walgreens of varying sizes. It went from an entirely different department to a Walgreens. From a pharmacy? For the purpose of taking hostages at one point out the door, but that didn't happen. But again, the purpose there was to take a hostage. That gets to whether it was facilitating escape. Here, the purpose was to commit the robbery. That element is met in either case. Take a bigger one. Take a Walmart. I mean, Walmart, I think if somebody went to a locked bathroom at one corner of a Walmart and pulled the people out in order to take them several hundred feet to wherever the cash is kept, I don't think a court would hesitate in saying, that's a different location. So what gives Ed's House of Pizza less protection, especially where it has this separate locked area? I think what we're all saying is that there is a rule of reason. The question is for everyone, where do you draw the line? And I come back to the question posed at the outset by Judge Smith. If the 2B3.1B4A talks about a four-point increase if a person was abducted to facilitate commission of an offense, then you go to the comment. The comment says, abducted means that the victim was forced to accompany the offender to a different location. For example, bank robbers forcing a bank teller from the bank into a getaway car could constitute an abduction. Could, not necessarily would. If that directional arrow is pointing to you need something akin to, in this case, taking a hostage or a kidnapping, and there's nothing plainly going the other way, where in the text is there something that says that we should have the low threshold that you're suggesting to us today? Well, with respect, I think there is something pointing the other way, and it's that locked door and that separate room with a separate purpose. I don't think I'm setting a low threshold at all. But I was not taking a hostage here. I mean, the people walked out the front door and the guy walked out the back door. But taking a hostage is only an example of facilitating the offense. The reason they walked out the front door here while he walked out the back... There's no other example given in the comment, is there? No, but it said, the guideline clearly says facilitating the offense or facilitating the state. Well, it gave you a separate purpose. Again, looking to the purpose of sentencing, what difference does it make whether or not the separate room has a different purpose or the same purpose as the main room? I mean, here you've got a separate purpose. Osborne was a separate purpose. He had a pharmacy. The comment talks about... Well, the comment's a whole different situation. That's a shield example. But why... You focused on different purpose several times, and that's appealing. That makes some sense, and it's a rule that can be applied. But what's the logic of that, the epidemiological logic? Well, I think it's one element. What I tried to say originally is the area is different in terms of configuration or purpose. Here you have both. But I'm not trying to limit it. Another thing that I agree with what my friend Ms. Scheib said in her argument is that we're not going to come up with a clear line in this discussion as hard as we try. We're going to look at it case by case. The hard case is going to be the same room, no barrier, maybe some pizza boxes. Do you think we need to come out with a definition of what a different location means, or do you think it should be done by defining that it exists in this present case, by taking victims out of a room? I think it's much better to do it case by case than the normal means of adjudication, and that's what eventually leads to more clarity. It's just hard to do otherwise. But the clarity, I have an institutional concern. We've been in the trees in this case. The guidelines puts us deep into the trees. Let's look at the forest for a minute. What would his guideline range have been if this had been a two-point instead of a four-point enhancement? It would have been a 19, I think, would have been the final level, as opposed to a 21. He got 37. He got the bottom of the guideline range. He got 37. And it would have been the top of the guideline range with two points, right? The bottom probably wouldn't have been 30. It's probably a seven-month difference. So why should we be engaged in all of this detail analysis post-Booker? Why shouldn't we just say 157 months, this two-point here, two-point there didn't mean a hill of beans difference? You would not get any argument from me, Your Honor. You would have none of the time, Mr. Sussman. But this court in Greer said otherwise in another NBank decision that the guidelines have to be appropriately calculated. So then the prudent district judges, when there's a contested issue, they will deny the enhancement, go to the lower one, and then put the guy at the top of the range. And then under Rita, they'll get affirmed, and then we won't have these. They can do that. We have consistently argued unsuccessfully in this court that plain error review should not allow relief where there's a very small guideline error like this, but the final guideline is within the same range. I know my colleagues in the District of New Jersey are presenting that issue to this court again because there is disagreement around the country. So you're not finding – I mean, the 120-month mandatory – I don't think I'm speaking out of turn. The 120-month mandatory drove the sentence here. Absolutely. We're talking about how many angels can dance on the head of a pin, aren't we? Yes, and we're here because Booker says and then Greer confirms that this court has to correctly calculate the guidelines as one of the 3553A factors that the district court will consider. But if you ask me at the end of the day, is there a harmless error component to this, I would say absolutely, but I have to be frank and say that that is inconsistent with current Third Circuit precedent. And this is a term of art. I mean, we're asking about standard of review, but there is a legal definition that, in addition to the maximum, the mandatory sentence that's driving it, of 10 years, there's this definition in the guidelines that is not very explicit that then tries to cast some light on that definition by using this example which I think all of us would agree. The example given in the commentary, that looks like an abduction, that walks like an abduction, that quacks like an abduction. This one, I'm not so sure it looks, walks, or quacks like an abduction. Frankly, your argument is pretty compelling about the separate purpose or separate location, I think you said. Well, as I was trying to say, and maybe I'll conclude on this, is that, again, there is a spectrum of cases, and I don't think this is the hardest case. Within a room, that's the hard case. Two rooms that are open to each other, that's eubanks. That's a middle ground, that's a harder case. Let me ask you something. The locked door makes this an abduction. That's dragging by the hair. Pulling them from this place of safety to a place of lesser safety in order to facilitate the crime. I think it's directly what the guidelines say. Okay, well, let's go to one and just forget questions. We could, if we decided to reconsider Greer, would we be able to in light of Booker? Probably not. All right. I think, well, but I think at the harmless era. It's not Congress. You answered the question. Thank you very much. Yes, sir. Thank you. Okay. I want to start by distinguishing Osborne. My opposing counsel, Mr. Zalzmer, has characterized that as virtually identical to the facts of this case and, in fact, described that it involved a place of sanctuary and removal from that place. But that's not what happened there. The two victims of the robbery were stationed at a pharmacy where they were working. They didn't hide into a place of sanctuary. It's a different set of facts. Upon the robber coming up to them at knife point, the robber then moved them into the locked location and then from there out, at all times, controlling their movement immediately before him. And the Osborne. Did that make it worse for you? I mean, by acknowledging that they weren't in a safe place to start with and were moved, doesn't that make this a more compelling case? Because these people did attempt to secrete themselves behind a locked door and hoped they wouldn't be found and hoped they wouldn't be pulled out, and they were. So if Osborne constitutes abduction, why wouldn't this where you kick the door down and brandish a weapon? No, I don't think so, because my point was that the question of a place of sanctuary was not at issue in Osborne. What was at issue was the use of them as hostages and what he did with them after that fact, which was taking them away and abducting them and trying to force them with him out of the Walgreens to a different location. So, no, I think Osborne is actually very helpful to our point. Osborne also arrested on coats, the case in the store where the little girl was tragically taken to a different location in the store, and the coat decision was there when Osborne was decided, and Osborne apparently felt that coats dictated the result in Osborne. Yes, and United States v. Coat took place in a large Target building, which, as Judge Ambrose pointed out, in these large department stores and malls and office buildings, you have an easier question, you have an easier case to find two locations within that point. But Ed's Pitch-a-Sop simply does not constitute two different locations. How about Mr. Zussman's point about the purpose of the separate part of the womb? Well, I would point out to what some of the judges here said, that the question of sanctuary and the safe place, that's not in the text of the guidelines, nor is it present in any case that I've seen applying this enhancement. Instead, they're looking to whether there was an abduction, whether these people were isolated. That didn't happen here. Whether they were used as shields or hostages. Again, it didn't happen here. Again, the language from your own brief, though, is some measure of increased risk, right? How can you deny that there's an increase in risk in taking somebody out of a locked room at gunpoint? I don't deny that, but that doesn't constitute... You've moved somebody, and they did move them, from a place of greater safety to a point of lesser safety. How is that not within the meaning of abduction and purpose of the guidelines to prevent a greater harm, a greater sense of, as Mr. Zossler put it, a greater sense of terror? If I may answer your question in two points. First, the abduction enhancement is about targeting conduct that implicates danger associated with abduction, not all harm that could take place in the course of a robbery. That's not the mechanism by which to do it. I think some of the judges here were implicitly referring to the district court's discretion to apply a variance, which they can do. I would say that the guidelines can be restrictive, but they haven't been deprived of all of their discretion. Post-Booker, they can apply a variance, and if that's what Judge Goldberg would like to do here, if this case is remanded... He wouldn't even have to do a variance. He's got an overlapping guideline range, so he could just go to the top of the range instead of the bottom of the range and get the same 157-month sentence if he applied the two-level restraint enhancement. Exactly. Assuming that restraint applies here, which we would contend that it didn't, and I would then hopefully be before some part of this court again... Isn't the level of danger the same here as once he knocks the door down or kicks the door, kicks a hole in and opens the door? Regardless of the movement of the individuals, they're at greater risk now because their safe haven has been breached. Yes, that actually brings me right to my second point in response to Judge Jordan's question, that as soon as Mr. Reynos entered the pizza shop, that place became a dangerous setting. And in fact, whenever any robber enters a building with the intent to rob someone, especially carrying a weapon, in a blink of an eye, you go from a safe place to a dangerous one. But the abduction enhancement is not about the change in safety. It's about abduction. It's not about necessarily confining it to some distance, 100 feet, 10 feet, or one foot. But, you know, in Osborne, you keep focusing on Osborne and trying to draw a distinction. In Osborne, they specifically say that the pharmacy section, because it was, you know, a separate section, was a different location than the rest of the Walmart... I'm sorry, Walgreens location. So, if you're... It's, you know, same floor, obviously separate. It just seems to be exactly this case. And I'm not getting the distinction you're trying to draw. I think there's a very large distinction there in that the defendant was kidnapping those people. He was abducting them. He was holding them and forcing them out of the store with them. But then you go back to Mr. Zalzmer's point, and that is that the issue is facilitating the escape or facilitating the crime. In Osborne, it's facilitating the escape. Here, it's facilitating the crime. So, if that's what the guideline provides, why aren't they the same? The guideline provides that when abduction is used to facilitate the offense, not near movement, not some action in response to a gunpoint command, so simply because... But with all respect, you can't keep saying abduction and have... It's like Judge Soder said earlier. You can't define abduction by referring to abduction. You've got to help us to help the district courts by talking about what that is. If you take somebody at gunpoint from one place to another place, it sounds like abduction. And then we're back to arguing, what's one place to another place? And if that's what we're arguing about, why shouldn't we be paying attention to what the district court said when it very carefully went through, reviewed the videotape, said, I'm looking at this tape. I've seen it carefully. You can move down a couple of hallways. It's not like they're right next to each other. If that's the studied judgment of the district court reviewing that evidence, why wouldn't we say, hey, you know what? That's the judge who was looking right at the tape and what happened. And there was a movement at gunpoint from one spot in the store to another spot in the store. It's abduction. What's wrong with the district court's reasoning? If I may answer your question and then briefly conclude. I see my time has expired. I think according to the... Fifteen seconds left. Oh, it says 11 seconds. Excuse me. I have some discrepancy. I'm eight now. Eight now. It's kind of like an Obama. So... I'm probably not going to get a chance to answer that. I would love to run, but I can't pull the hammer down on Mr. Zauber. Couldn't she answer what's wrong with that? Is it going to be answering the question? Yes, I will answer that question. That was a stupid question, Mr. Zauber. This is an example. Why would they ask a lawyer whether or not... Go ahead. I think everyone agreed the majority panel as well that this was a question of legal interpretation as a matter of, in this appeal, it's de novo review and once that we have a legal interpretation, if then Judge Goldberg can apply that. That answers the question. Thank you. I'd ask that this court reverse and remand. Thank you. It might be helpful to understand the reviews that we've touched on a little bit. If both counsel could submit a 28-J letter on that one issue, the standard of review here, specifically U.S. v. Richards has been mentioned and the extent to which, if at all, U.S. v. Richards informs the standard of review here. And the continued vitality of Buford. Right. If you do that within seven days, if that's appropriate. Seven days, yeah. Pardon me? Seven days. Is that okay? That's fine. When I do want to... Ms. Scheib, you're pro bono, I believe, aren't you? I was not connered if the winning was appointed as CJA counsel. Oh, okay, okay. I wanted to thank both of you. Excellent argument. We're used to Mr. Zalzmer's exemplary performance in oral arguments. We haven't seen you before, but to be congratulated. You did a fine job. Both counsels are really, at least speaking for myself, and I've met other people too, it's a pleasure to be here and hear this kind of quality argument from such fine professionals. You did a great job. You really did. Both of you. Thank you very much. That's a reasonable comment. That's a reasonable comment. After all these years with Zalzmer, you finally got me to say something.